## RECORD NO. 13-2393

### IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

ALEXANDRIA SURVEYS, INTERNATIONAL, LLC,

*Debtor,*

ALEXANDRIA CONSULTING GROUP, LLC,

*Appellant,*

v.

ALEXANDRIA SURVEYS, LLC,

*Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

JUDGE LIAM O'GRADY

### RESPONSE BRIEF OF APPELLEE

Richard G. Hall
ATTORNEY-AT-LAW
7369 McWhorter Place, Suite 412
Annandale, Virginia 22003
(703) 256--7159
richard.hall33@verizon.net

*Counsel for Appellee*                          May 2, 2014

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477
A Division of Lantagne Duplicating Services

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __13-2393__       Caption: __Alexandria Consulting Group, LLC v. Alexandria Surveys, LLC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

Alexndria Surveys, LLC
(name of party/amicus)

who is _____the Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐ YES ☑ NO

2.     Does party/amicus have any parent corporations?                                ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                              ☐ YES ☑ NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☑ YES ☐ NO
If yes, identify any trustee and the members of any creditors' committee:
Robert O. Tyler, Chapter 7 Trustee

Signature: /s/ Richard G. Hall _____    Date: _____11/22/2013_____

Counsel for: _____

## CERTIFICATE OF SERVICE
**************************
I certify that on _____11/22/2013_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Richard G. Hall _____          _____11/22/2013_____
(signature)                                                              (date)

# TABLE OF CONTENTS

Page

Table of Authorities . . . . . . . . . . . . . . . . . . . . . ii

Statement Regarding Jurisdiction . . . . . . . . . . . . . . . 1

Procedural History . . . . . . . . . . . . . . . . . . . . . . 1

Note Regarding Citations to Joint Appendix . . . . . . . . . . 2

Parties to the Appeal . . . . . . . . . . . . . . . . . . . . 3

Summary of Facts . . . . . . . . . . . . . . . . . . . . . . . 4

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . 7

Applicable Standard of Review . . . . . . . . . . . . . . . . 12

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    ACG Was Not an Interested Party in the Bankruptcy
    Case . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    The Bankruptcy Court Erred in Reopening the Case on
    the Motion of a Non-Interested Party . . . . . . . . . . 15

    The Order Reopening the Debtor's Bankruptcy Was Not
    A final Order and Was Appropriately raised on Appeal . . 17

    The Telephone Number and Website Address Were Not
    Property of the Estate, and Were Not Subject to Sale
    By the Trustee . . . . . . . . . . . . . . . . . . . . . 19

    Any Service Contract With the Debtor and All Rights
    Thereunder Were Irrevocably rejected by the Trustee . . 25

    The Court Lacked Any Basis Upon Which to Make a
    Distinction Between "Computers" and "Servers" . . . . . 28

    A Review of Some Factual Errors Found in the
    Appellant's Brief . . . . . . . . . . . . . . . . . . . 30

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Statement regarding the need for Oral Argument . . . . . . . . 33

i

Certificate of Compliance . . . . . . . . . . . . . . . . . 34

Certificate of Service . . . . . . . . . . . . . . . . . 35

# TABLE OF AUTHORITIES

## CASES

Page

*In re best Re-Manufacturing Co.*,
    453 F.2d 848 (9th Cir. 1971)..............................21

*Business Edge Group v. Champion Mortgage Co., Inc.*,
    519 F.3d 150 (3rd Cir. 2008)................................21

*Butner v. United States*,
    440 U.S. 48, 99 S. Ct. 914, 59 L. Ed. 136 (1979)..........20

*In re Connecticut Pizza*,
    193 B.R. 217 (Bankr.D.Md.1996)............................56

*Darman v. Metropolitan Alarm Corp.*,
    528 F.2d 908 (1st Cir.1976)...............................21

*In Re: JOHNSON*,
    960 F.2d 396 (CA4 1992)...................................12

*In re Giddens, M.D. v. Kreutzer (In re Kreutzer)*,
    2006 WL. 1666187 (N.D. Okla. 2006)........................16

*Litton v. Wachovia Bank (In re Litton)*,
    330 F3d 636 (4th Cir. 2003) ..............................12

*In re Mailman Steam Carpet Cleaning Corp.*,
    196 F.3d 1 (1st Cir. 1999), and *In re Giddens,
    M.D. v. Kreutzer*.........................................16

*Network Solutions, Inc. v. Umbro International, Inc.*,
    529 S.E.2d 80 (Sup. Ct. Va., 2000)........................23

*Nintendo Company LTD. v. Leslie A. Patten (In Re: Alphex Computer
    Corporation)*,
    71F.3d 353 (10th Cir. 1995)...............................16

*RCI Tech Corp. v. Sunterra Corp. (In re Sunterra Corp.)*,
    *361 F.3d 257*.............................................12

*Reese Exploration, Inc, v. Williams Natural Gas Co.*,
    983 F.2d 1514 (10th Cir. 1993)............................12

*Rothman v. Pacific Telegraph & Telegraph Co.,*
    453 F.2d 848 (9th Cir.1971), cert. denied, 406 U.S. 919,
92 S.Ct. 1771, 32 L.Ed.2d 118 (1972).........................20, 21

*Matter of Sec. Investment Properties, Inc.,*
    559 F.2d 1321 (5th Cir. 1977)................................21

*Slenderella System of Berkeley, Inc. v. Pacific Telegraph & Telegraph*
    *Co.*, 286 F.2d 488
    (2nd Cir. 1961)..........................................20, 21

*In Re Star Net, Inc.,*
    355 F.3d 634 (7th Cir 2004)..................................21

*U.S. v. Childress,*
    *104* F.3d 47 *(4th Cir.* 1996)................................12

*Yadkin Valley Bank v. Magee,*
    5 F.3d 750 (4th Cir. 1993)...................................16

**STATUTES**

11 U.S.C. § 365(d)(1).........................................26
11 U.S.C. § 365(p)(1).........................................26
11 U.S.C. § 541(a)(1).....................................20, 24
11 U.S.C. § 554(c).......................................2, 6, 29
11 U.S.C. § 554(d)............................................22
11 U.S.C. § 348(b), '........................................26
11 U.S.C. § 350(b)...........................................15

Virginia Code § 8.01-466.....................................24
Virginia Code § 8.01-478.....................................24
Virginia Code § 8.01-487.....................................24
Virginia Code § 8.01-501 ....................................24

**RULES**

Fed. R. App. P. 6............................................12
Fed. R. Bankr. P. 1109(b)...................................15
Fed. R. Bankr. P. 3001(e)(1)................................14
Fed. R. Bankr. P. 5010......................................15
Fed. R. Bankr. P. 8013......................................12

**STATEMENT REGARDING JURISDICTION**

The appellee supports and adopts the Jurisdictional Statement of the appellant.

**PROCEDURAL HISTORY**

An appeal to the Alexandria Division of the United States District Court was taken from a final order entered in the Alexandria Division of the United States Bankruptcy Court for the Eastern District of Virginia approving the Chapter 7 trustee's motion to sell property of the debtor, including surveying files, the debtor's telephone number and website address, and the debtor's computer servers, which followed an order reopening the chapter 7 case on the motion of the Alexandria Consulting Group (hereafter ACG). The Appellee here, Alexandria Surveys LLC (hereafter Alexandria LLC), appealed the portions of the order authorizing the sale of the telephone number and web address and the computer servers, but, for practical reasons, did not appeal the portion of the order authorizing the sale of the debtor's paper surveying files. Alexandria LLC also argued in its appeal that the case had been improperly reopened.

The District Court found that: (1) since ACG was not a party in interest in the bankruptcy, the bankruptcy case had been improvidently reopened, and that all of the orders that followed and related to the sale were void, (2) that the telephone number and website address used by the debtor were not property of the estate and could not be sold by the trustee, and (3) that the

1

computer "servers" were included in the designation of "computers" on the debtor's bankruptcy schedules, and had thus been abandoned pursuant to 11 U.S.C. 554(c) upon the original closure of the case.

From this order of the District Court, an appeal was taken here.

## A NOTE REGARDING CITATIONS TO THE JOINT APPENDIX

The appellant did not furnish the appellee with a paper copy of the Joint Appendix (hereafter the JA). As a result, the appellee is working with the electronic version filed by the appellant on April 2, 2014. However, there appear to be blank pages throughout the electronic version of the JA. One result of this is that the page numbers assigned to the JA by the court, and which appear at the top of the electronic page, are inconsistent with the numbers assigned to each page by the appellant. The appellant's page numbers appear near the bottom of each page, and are either Bates stamped or hand-drawn. For example, to chose one page at random, the electronic version of page "9" of the JA appears as Bates stamp "3" in the original document. Unfortunately, the divergence in page numbers is inconsistent throughout the JA, so there is no simple solution aside from making a choice to use one numbering system or the other and sticking to it.

In the brief that follows, the appellee will use the Bates stamp page numbers at the bottom of the page, on the assumption

that the court has a paper copy of the JA and will most likely be working from that.

## PARTIES TO THE APPEAL

The unusual nature of this case makes it important at the outset to clarify who the parties are and how they relate to the underlying Chapter 7 proceeding.

Robert O. Tyler is the Chapter 7 trustee of the debtor, Alexandria Surveys, International, LLC (hereafter Alexandria International).

The appellee, Alexandria LLC is a surveying firm operating in Northern Virginia that took over the telephone number, the web address, some of the computer equipment, and a portion of the surveying files of the debtor. Alexandria Surveys was not a creditor of Alexandria International, and was not a party to the chapter 7 proceeding.

The appellant, ACG, is a surveying firm operating in Northern Virginia, and is a direct competitor of Alexandria, LLC. It is not a creditor in this bankruptcy case, nor does it have any connection with or claim against the debtor. For a time when the debtor's chapter 11 case was pending, ACG and the debtor shared office space. Once the debtor ceased operations and dismissed its staff, some of the surveyors who used to work for the debtor formed a new entity "Altera Surveys" (see JA 602:17-603:4) and associated themselves with ACG, doing the same surveying work as the debtor in

3

direct competition with Alexandria LLC.  It is the appellee's position that ACG is not an interested party in the bankruptcy of Alexandria International.

## SUMMARY OF FACTS

The debtor, Alexandria International, performed residential surveys for decades in the Northen Virginia area.  In recent years the business began to fail, and on March 3, 2010 it filed a chapter 11 case as a debtor in possession. Unfortunately, the debtor's business grew worse, and the case was converted to one under Chapter 7 on January 27, 2012.

Robert O. Tyler was appointed as the Chapter 7 trustee and conducted a Section 341 hearing on March 14, 2012. On April 18, 2012, Mr. Tyler filed a no-asset report, and the case was closed on May 18, 2012.

On November 11, 2012 ACG, acting on its own, filed a motion to reopen the case alleging that there were assets it wished to purchase from the estate.  The motion alleged that the telephone number, the website, and other property of the debtor were not listed on the debtor's schedules, and had therefore not been abandoned when the case was closed.

The debtor filed a response opposing the motion; the trustee did not file a response or make any appearance. Alexandria LLC. was not a party to the bankruptcy and did not make an appearance.

On December 31, 2012 the court entered an order reopening the

4

case, while at the same time it reserved any ruling on whether the assets in question had been abandoned or not.   On February 12, 2013 the trustee filed a motion to approve the results of a private auction at which ACG purchased the telephone number, the website address, some surveying files, the computer equipment and furniture of the debtor. The motion was opposed by Alexandria LLC, and after a two day evidentiary hearing, the bankruptcy court approved the sale of the debtor's old telephone number, its former web address, its surveying files, and some of its computer equipment.

The order approving the sale, and directing Alexandria LLC to turn certain items over to ACG was entered on April 27, 2013. An appeal to the United States District Court was noted three days later, on April 30.

The debtor, Alexandria International, made no appearance after opposing ACG's motion to reopen the case, and is not a party to this appeal.

In Alexandria LLC's appeal to the District Court it raised the following issues:

(1) Alexandria LLC submitted that ACG was not an interested party in the bankruptcy proceeding of the debtor, Alexandria International, and therefore had no standing to ask the court to reopen the case.   ACG was not a creditor, nor an owner of the debtor, nor an agent of the trustee.   At the time it filed its motion to reopen the bankruptcy, it was completely a third party to the proceeding who merely wished to buy assets in the hands of its competitor.   The Alexandria LLC argued that the court erred in

reopening the case on the motion of ACG.

(2) Alexandria LLC argued that the telephone numbers and website address of Alexandria International were not the property of the debtor, and therefore not property of the estate which the trustee had the ability to sell to a third party. Alexandria LLC submitted that under controlling state law, the telephone number and website address were property of the service provider in which the debtor lacked any property rights. Alexandria LLC argued that, at best, the telephone number and website address were part of a service agreement or executory contract between the debtor and the service provider, which was not assumed by the trustee, and was irrevocably rejected when the case was closed. Alexandria LLC argued that the order entered by the bankruptcy court authorizing the trustee to sell the telephone number and the web address to ACG was an error.

(3) Alexandria LLC argued that the "servers" were abandoned pursuant to 11 U.S.C. 554(c) upon the closing of the case. The debtor listed "computers" on its Schedule "B" as personal property. The court found that the debtor's desktop computers had been scheduled and abandoned by the closure of the case, but the servers were not and remained property of the estate. Alexandria LLC argued that there was no evidence or testimony upon which the court could arrive at a distinction between desktop computers and servers, which were, in fact desktop computers used in that capacity.

6

## STATEMENT OF FACTS

Alexandria International is a one-member LLC formed and owned by John Hoofnagle in 2000. Alexandria International assumed the business and assets of an earlier firm, Alexandria Surveys, Inc. which had been active in the Northern Virginia area for decades. From its beginning until it ceased operations in October of 2011, Alexandria International performed residential surveys in the Northern Virginia area. Many of its surveys, including house location surveys, were kept in paper files, while many were digitized and kept on computers, including desktops and servers. After filing the chapter 11, Alexandria International's business continued to dwindle to almost nothing, See JA 425:15-426:9. By October of 2011, the debtor had gone through all of its working capital and was unable to pay either its rent, its light bill, or its telephone bills. At the same time, the debtor's principal, John Hoofnagle [1], had exhausted all of his personal resources, and had no further money to put into the business. See JA 432:25-433:8, and JA 493:7-18.

The debtor's schedules were not amended in any significant way upon the conversion to Chapter 7. The debtor listed "computers" on Schedule B-26 (Office Equipment) with a value of $3,895.00. See JA 198. The debtor did not list its telephone number or web address on

---

[1] For some reason, not explored in the trial court, Mr. Hoofnagle is called by either the name "John" or "Paul". The names, John Hoofnagle and Paul Hoofnagle appear in the transcript, but they both refer to the same person.

7

its Schedule B, but instead listed the service agreement with Cox Business Services for both internet service and Basic Centrex Service (telephone) on its Schedule G (Schedule of Executory Contracts). See JA 47.

When it ceased business in October of 2011, it dismissed its remaining staff, which it could no longer pay, and stopped soliciting new clients. From that point, until March of 2012, the debtor's receivables amounted to only a single check for $75.00 for work performed prior to October 2011. See JA 10:2-4.

At the same time, in October of 2011, Mr. Hoofnagle's wife, Sharon Hoofnagle, and Michael Flynn formed Alexandria LLC; Mrs. Hoofnagles share being 1/3 and Mr. Flynn's being 2/3. Mrs. Hoofnagle had performed various office duties for the debtor, including bookkeeping, paying the bills, and being the office receptionist, but she held no office and had no ownership interest in the debtor, See JA 424:22-25. Mr. Flynn was licensed surveyor who owned another company, Merestone Surveying, which had occasionally done surveying work the debtor was unable to do in the Summer and Fall of 2011.

In late October, when no money was left to pay the telephone bill, Mrs. Flynn called Cox to cancel the debtor's account. Cox then told her that the number was available and she had it transferred to Alexandria LLC. See JA 523:11-525:12, See also JA 517:16-25. The same procedure was followed with Cox for the debtor's website address.

Alexandria LLC began operating a new surveying company out of

8

the debtor's old location, paying the rent and the telephone and utility bills. See JA 597:20-599:8.    No customers, receivables, or accounts of the debtor Alexandria International were transferred to Alexandria, LLC, which was capitalized by the sweat equity of Michael Flynn and Sharon Hoofnagle and began from scratch. See JA 599:5-600:1. Starting out, Alexandria LLC did little business, and was barely able to pay its bills, even though neither Mrs. Hoofnagle nor Mr. Flynn were taking paychecks. By dint of hard work, good customer service, by making cold calls to title companies, and marketing, Alexandria LLC established a profitable business. See JA 597:13-JA599:25. Also see JA 610:13-612;10. The debtor's old telephone number, while it was not of much use in the beginning, became valuable once Alexandria LLC established its own client base. Mr. Flynn testified that few calls came in on the line until five months later in March of 2012. See JA 651:1-652:24.

Although Mr. Hoofnagle retained a small office at the debtor's location, he performed no services for the new company. Instead, he began developing an unrelated business that provides engineering and security service for foreign countries, and drove Mrs. Hoofnagle to and from their home in Anne Arundle County, Maryland. See JA 423:25-424:2. Despite the colorful picture the appellant paints of Mr. Hoofnagle somehow managing the affairs of Alexandria LLC as a Svengali-like figure through some hidden influence or ownership interest, Mr. Flynn testified that he wanted no part of Mr. Hoofnagle in his business.  He offered the strong opinion that Mr. Hoofnagle was a very bad businessman, having taken the debtor

to ruin, and he saw no benefit in having him associated with Alexandria LLC in any way. See JA 647:23-648:18.

Mr. and Mrs. Hoofnagle appeared at the Chapter 7 Section 341 meeting and were interviewed by the trustee, Robert O. Tyler. Mr. Tyler was perhaps the court's most experienced trustee, having served in that capacity since the 1960s. See JA 391:14-16. Mr. Tyler offered to sell the computers and other assets back to Mr. Hoofnagle, but stated that, in his opinion, there was little else he could do to obtain value from them. See Transcript of 341 Meeting, JA 220:2-9.

After the meeting, Mr. Tyler received a letter and at least one telephone call from Craig White, an unrelated creditor, telling him that the debtor's paper surveying files had value, and urging him to try to sell them. See JA 199. Nevertheless, Mr. Tyler filed a report of No Distribution (a no-asset report) and on May 18, 2012, the case was closed. See Docket Items Nos. 188 & 189, JA 253.

Soon after the Chapter 7 was closed, Mr. Hoofnagle cleaned out the offices of Alexandria International. He disposed of many of the debtor's paper surveying files, and some of its computer equipment and furnishings. The balance he gave to Alexandria, LLC. See JA 430:4-431:13. Alexandria LLC leased another office and moved the remaining computer equipment, including the desktops and servers, into their new quarters.

On November 7, 2012, ACG fled a motion to reopen the bankruptcy of Alexandria, International. ACG was not a creditor of

10

the debtor, nor had it participated in the original case in any way. Like Alexandria LLC, ACG was engaged in residential surveying in the Northern Virginia area. ACG was in direct competition with Alexandria LLC. In fact, their offices were within sight of each other and both drew their customers from the same pool of prospects in the Northern Virginia area. Nevertheless, over the objection of the debtor, and without any participation or appearance by the trustee, the court entered an order reopening the case on December 31, 2011. See JA 178-180.

Later, in early February, the trustee held a private auction at which ACG was the successful bidder for the debtor's telephone number, it website address, and its computer equipment. On February 12, 2013, the trustee filed a motion seeking authority to sell the auctioned items to ACG. On the next day, February 13, 2013, Alexandria LLC filed an objection to the trustee's motion.

On March 26, 2013 the bankruptcy court held an evidentiary hearing on the Trustee's motion and Alexandria LLC's objection. The hearing was concluded on April 18, 2013, after which the court announced its decision. Pursuant to the court's ruling, an order was entered on April 26, 2013 directing Alexandria LLC to turn over to ACG its telephone number, its website address, the computer server of the debtor, and all of the debtor's paper surveying files. On April 30, 2013 Alexandria LLC noted its appeal. Alexandria LLC appealed the decision to reopen the case, the decision to turn over the telephone number and website address, and the decision to turn over the server. The order to turn over the

11

paper surveying files was not appealed.

## APPLICABLE STANDARD OF APPELLATE REVIEW

The findings of fact as entered by the Bankruptcy Court are subject to review under a "clearly erroneous" standard, as provided for in Rule 8013 of the Federal Rules of Bankruptcy Procedure, whereas conclusions of law are subject to a review *de novo, In Re: JOHNSON*, 960 F2d 396 (CA4 1992), *RCI Tech Corp. v. Sunterra Corp. (In re Sunterra Corp.) 361 F3d 257 263* (4th Cir 2004, and *U.S. v. Childress, 104 F3d 47, 50 (4th Cir.* 1996), and see also Rule 6, of the Federal Rules of Appellate Procedure.

Mixed questions of fact and law which are also reviewable *de novo, Litton v. Wachovia Bank (In re Litton)*, 330 F3d 636 642 (4th Cir. 2003). In addition, the reviewing court is considered to be in as good a position as the lower court to construe a written document, in this case the debtor's Schedule B. See *Reese Exploration, Inc, v. Williams Natural Gas Co.*, 983 F2d 1514, 1518 (10th Cir. 1993) ("Interpreting written documents is a question of law subject to *de novo* review").

The Appellee submits that all issues relevant to this appeal are either purely issues of law or mixed issues of law and fact, and therefore subject to review by this court *de novo*.

12

**ARGUMENT**

<u>ACG Was Not an Interested Party in the Bankruptcy Case</u>

One of the very curious aspects of this case is the manner in which the identity of the appellant, ACG, has continued to evolve through the various levels of appeal.

In its present brief, ACG styles itself as the successor in interest to a creditor of the debtor, a Romanian entity known as SC Alpha Engineering who it now states had explicitly assigned to it their claims against the debtor.  In the District Court, ACG filed a motion to reconsider, stating that one of its principals, Chris Ortan, was somehow associated with Alpha, and, although not stated, the inference the appellee wanted the District Court to draw is that since Ortan possessed some ownership interest in both ACG and Alpha, ACG had somehow assumed Alpha's claim against the debtor.

In the bankruptcy court, absolutely no mention was made of ACG's supposed status as a creditor, neither in its original motion to reopen, nor at any point in the trial.

In its argument for a stay pending appeal in this court, ACG took a step further and presented an unsigned affidavit from Mr. Ortan alleging that at all times he was acting as an agent for Alpha, and presumably so when ACG asked the Bankruptcy Court to reopen this case.  However, no evidence before this court nor any evidence in the record at the trial level that supports this claim,

13

and a significant amount of evidence contradicts it.  See testimony of John Hoofnagle that Chis Ortan was, in fact, not a member of ACG, JA 434:11-21.  Mr. Hoofnagle's testimony was not rebutted.[2]

All that notwithstanding, neither ACG nor Aplha filed a proof of claim in the bankruptcy case.  A copy of the Bankruptcy Court's Claims Register and a verification of claims filed at the deadline for filing are found at JA 124-133 and JA 712. It would be a very puzzling lapse on the part of Ortan not to file a Proof of Claim, if, as ACG now argues, he was at all times acting as the agent of a creditor, Alpha and sought to reopen the bankruptcy to have assets administered for the benefit of creditors.  In addition, nowhere in the bankruptcy case docket, nor anywhere in the record, is there even a hint of a Notice of Transfer of Claim from Alpha to either Ortan or ACG as required by Rule 3001(e)(1) of the Federal Rules of Bankruptcy procedure.

By way of acknowledging that no evidence exists to support its claim to be a creditor, ACG argues that it never had a chance to introduce such evidence because the Bankruptcy Court ruled before it had a chance to present its case. The inference that ACG would like this court to draw is that it was somehow unfairly denied an opportunity to present evidence on this point that it now alleges that it always had, and would have presented, had the court not cut

---

[2] In fairness to the appellant, counsel for the appellee must say that he doubts the testimony of Mr. Hoofnagle on this point, but has no independent information on the matter one way or the other.  Despite that, Mr. Hoofnagles remarks remain the only words spoken on the subject of Mr. Ortan's connections with ACG that exist in the record.

14

it off. However, it was ACG's counsel who asked for judgment at the close of Alexandria LLC's evidence, and it is they who must bear the consequences for not having evidence introduced past that point. See JA 655:17-20.  Likewise, nothing appears in ACG Exhibit List (JA 297 *et seq*.) that would have established its claim to be a creditor, nor was any mention of it made when ACG sought to reopen the case, contrary to what one might expect. See JA 142-150 and JA 163-178.

In summary, there is no evidence before this court nor was there even a hint in the record of anything before the bankruptcy court that ACG was a creditor of the debtor.  ACG's claims to be creditor only appear subsequent to the District Court's Opinion and must be seen as a creative attempt to address a problem that cannot be solved otherwise. They should not be entitled to any consideration, and should be given little, if any, credibility.

<u>The Bankruptcy Court Erred in Reopening</u>
<u>The Case on the Motion of a Non-Interested Party</u>

While 11 U.S.C. 350(b) authorizes the court to reopen a case to administer assets or for "other cause", Rule 5010 of the Federal Rules of Bankruptcy Procedure limits the class of those who may file that motion to "The debtor or other party in interest". Although Rule 5010 does not define who may be a party in interest, and while the term "party in interest" is not among the definitions found in Section 101, guidance can be found in Section 1109(b) which describes a party in interest as "The debtor, the trustee, a creditors' committee, an equity security holders' committee, a

15

creditor, an equity security holder, or any indenture trustee" This definition has been held to apply to Chapter 7 proceedings, see *In re Mailman Steam Carpet Cleaning Corp.,* 196 F3d 1, 5 (1st Cir. 1999), and *In re Giddens, M.D. v. Kreutzer (In re Kreutzer)*, 2006 WL 1666187 (N.D. Okla. 2006).

In *Yadkin Valley Bank v. Magee*, 5 F3d 750 (4th Cir. 1993) the Court of Appeals defined a party in interest as "*.. to include all persons whose pecuniary interests are directly affected by the bankruptcy proceedings*". The requirement that standing to reopen a case exists only if the bankruptcy proceeding "directly affects" a party's pecuniary interest, clearly excludes ACG who had no claim against the estate, the trustee, or the debtor, and whose only possible pecuniary interest in the bankruptcy was to obtain possession of assets in the hands of its competitor, which likewise was not a party to the bankruptcy.

An analogous situation arose in *Nintendo Company LTD. v. Leslie A. Patten* (*In Re: Alphex Computer Corporation)* 71 F3d 353, (10th Cir. 1995) in which the 10th Circuit Court of Appeals, taking into consideration the 4th Circuit's holding in *Yadkin Valley Bank* v. Magee, directly considered the question of standing for the purpose of filing a motion to reopen a bankruptcy case under Section 350(b). The court found that "*When we peruse the case law on standing under these circumstances, we find that the concept implicitly confined to debtor, creditors, or trustees, each with a particular and direct stake in reopening ...*".

The appellee has not uncovered a single persuasive case holding

16

that an outside party such as ACG, a party not a creditor and wholly unrelated to the bankruptcy proceeding, was found to have standing under Rule 5010 to move the court to reopen a bankruptcy case. And it is little wonder why, since it is easy to foresee the chaos that would develop if the doors to the bankruptcy court were opened to business rivals, reporters, or to anyone who wanted to come in and reopen a closed case for any purpose.

The appellee argues that the District Court properly found that the Bankruptcy Court erred in entering an order reopening this case on the motion of ACG, as there was no authority under Rule 5010, nor any case law, that gave ACG standing for that purpose.

### The Order Reopening the Debtor's Bankruptcy Was Not a Final Order and Was Appropriately Raised on Appeal

The Appellant argues that the issue of its standing could not be argued in Alexandria LLC's appeal to the District Court because it was never raised in the trial of the Trustee's Motion to Sell. Although ACG does concede that the Appellant raised the issue of standing in its opposition to the trustee's Motion to Sell, and thus the appeal was not, in fact, the first time the Alexandria LLC raised the issue, ACG argues that Alexandria LLC should have argued the issue either as part of the evidentiary hearing, or when the motion to reopen the case was filed by ACG in December of 2012. The appellant's argument is misplaced for two reasons.

First, the order reopening the case for the purpose of selling the debtor's assets was not a final order. It could only have been

17

appealed as an interlocutory order with permission of the bankruptcy court. By contrast, the order authorizing the sale on the trustee's motion was a final appealable order. Since the court's final order was the order authorizing the sale which, in turn, followed the court's non-final order reopening the bankruptcy case, it is was appropriate for the Alexandria LLC to raise that issue in its appeal.

Second, as noted by the District Court, Alexandria LLC was not a party to the motion to reopen the case, nor did Alexandria LLC make an appearance in that matter, either formally or otherwise. While it is true that the owners of the Alexandria LLC had actual notice of the hearing to reopen, and certainly they had some intimation of how things would develop, they were not directly involved at that point and would not have had standing to object to the motion to reopen, since Alexandria LLC, like the appellee, ACG, was not yet a party in interest. Only later, when the trustee filed a motion to sell the property they had in their possession, did the Alexandria LLC become an interested party.

In it brief before this court, the appellant chides the District Court for its lack of knowledge of bankruptcy law, and its confusion over use of terminology in Bankruptcy procedure. See appellant's Brief, page 27. The appellant contends that the District Court construed the term "party" incorrectly, and offers a bit of tutoring on the subject by pointing out that until an adversary proceeding is filed, there are no parties in a bankruptcy case. Thus, when the District Court found that Alexandria LLC was not a

18

"party" to ACG's motion to reopen, it was mistaken, since the motion to reopen was not an adversary proceeding and could not by definition generate "parties". Therefore, by its reasoning, Alexandria LLC was a party (or not) to ACG's motion to reopen.

This contention is so bizarre and misconceived that the appellee hardly knows where to start in deconstructing it. One must begin by assuming that a sitting District Court Judge is perfectly aware of adversary proceedings in the Bankruptcy Court, if for no other reason than they generate numerous appeals. From there, it is hard to conceive how the District Court made the fundamental mistake in terminology that ACG accuses it of. Instead, it is the appellant who has not understood the point made by the District Court: Alexandria Surveys was not a party to the motion to reopen because it was neither the debtor nor a creditor, and, like the appellant, was not a party in interest at the time the case was reopened. The fact that Alexandria LLC may have had notice of the hearing, does not confer upon it *ipso facto* the status of a party. Even if Alexandria LLC had appeared at the hearing, and even if it had argued its position against reopening the bankruptcy case, it would have no more been a party in interest than ACG was at the time, and likewise, would have had no standing.

<u>The Telephone Number and Website Address</u>
<u>Were not Property of the Estate</u>
<u>And not Subject to Sale by Trustee</u>

The telephone number and the website address used by the debtor were neither the property of the debtor nor property of the

19

bankruptcy estate, and could not be sold by the trustee.

Property of the estate is described in 11 U.S.C 541(a)(1) as ".... *All legal and equitable interests of the debtor in property as of the commencement of the case*." With some few exceptions related to the trustee's strong-arm powers to reverse fraudulent conveyances and recapture preferences, and also as set forth in the numerous exceptions specifically cited in the sub-sections (b),(c) and (d), the property rights the trustee assumes from the debtor are determined under state law. See *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed. 136 (1979).  Simply put, a debtor must have a property interest cognizable under state law before a thing may become property of the estate under Section 541(a)(1), or, conversely if a debtor lacks a property interest in something, it does not become property of the estate.

There have not been as many reported decisions concerning a trustee's power to sell the telephone numbers of the website address as one might expect, given the significant growth of the telecommunications industry over the past two decades. Historically, at least two circuit courts of appeal have ruled that the trustee lacks the right to do so, holding that the telephone number of a debtor does not become property of the estate.  See *Slenderella Sys. of Berkeley, Inc. v. Pacific Tel. & Telegraph Co.*, 286 F.2d 488, 490 (2nd Cir.1961) (finding that telephone numbers were not the property of the estate, nor in possession of the debtor); *and Rothman v. Pacific Tel. & Telegraph Co.*, 453 F.2d 848, 849-50 (9th Cir.1971)(following the decision in *Slenderella*), cert. denied, 406

20

U.S. 919, 92 S.Ct. 1771, 32 L.Ed.2d 118 (1972).[3]

ACG argues that there is a split of authority among the circuits on the question of whether a telephone number or a website address is property, but it presents no recent authority, none within the last forty-five years, at the circuit court level to sustain its position, and the changes that have occurred in the telecommunications market over the last forty-five years would have been almost inconceivable at the time those cases were decided. Although there is such a split as ACG argues, the clear weight of authority is in Alexandria LLC's favor, with a clear trend in the more recent cases in support of the District Court's position.[4]  In addition, the Federal Communications Commission has consistently ruled that "Section 251(e)(1) of the Communications Act gives the Commission exclusive jurisdiction over "those portions of the North American Numbering Plan that pertain to the United States." .... The Commission has often stated that telephone numbers are a public resource, and neither carriers nor subscribers "own" their telephone numbers.  Moreover, courts have found that no one has a property

---

[3] One circuit court has reached the opposite conclusion. See *Darman v. Metropolitan Alarm Corp.*, 528 F.2d 908, 910 n. 1 (1st Cir.1976)

[4] The 5th and 1st Circuits have held telephone numbers to be the property of the subscriber, see *Matter of Sec. Inv. Properties, Inc*. 559 F2d 1321 (5th Cir. 1977) and *Darman v. Metro Alarm*, 528 F2d 908 (1st Cir. 1976).  The 3rd, 7th, 9th, and 2nd Circuits have held that the subscriber has no property interest in its telephone number, see *Business Edge Group v. Champion Mortgage Co., Inc.* 519 F3d 150 (3rd Cir. 2008), *In re best Re-Mfg. Co.*, 453 F2d 848 (9th Cir. 1971), *In Re Star Net, Inc.*, 355 F3d 634 (7th Cir 2004), *Slenderella Systems of Berkley, Inc. v. Pac. Tel & Tel.*, Co., 286 F2d 488 (2nd Cir. 1961). See also

interest in a telephone number [a footnote appears at this point citing the case of *In re StarNet, Inc*.]. See Federal Communications Commission, CC Docket No. 95-155.

It is easy to see why the FCC would conclude that a subscriber lacks a property right in its assigned number or website address is incompatible with our current telecommunications industry, as the opposite conclusion would it impair the industry's growth and the FCC's authority to regulate it by interfering with what it noted was the "North American Numbering Plan".

However, when seen from a bankruptcy perspective, the results of holding that a debtor has a property right in their telephone number would be catastrophic. Almost no debtor, whether it be a consumer or a business, lists a telephone number on their schedule of property, nor have they ever. In these days, when the average person (or debtor) may have two, three, or more, home phones, cells phones, tablets, and the like, these unlisted (on their schedules) numbers, if deemed property of the estate, would eternally remain property of the trustee, even after the case was closed. See 11 U.S.C. 554(d). This would mean that if long after the close of a bankruptcy, the unscheduled number were later assigned by the service provider to a successful business, the trustee might reopen the bankruptcy case to claim the number and strip the new owner of it new-found value.

Alexandria LLC submits, however, that following the reasoning of the Supreme Court in *Butler* (cited above), namely that state law determines the debtor's pre-petition property rights, the question

22

of whether a telephone number or a website address becomes property of the estate has been conclusively decided for cases arising in Virginia by the Virginia Supreme Court in *Network Solutions, Inc. v. Umbro International, Inc.*, 529 S.E.2nd 80, (Sup. Ct. Va., 2000).

In *Network Solutions*, the Circuit Court of Fairfax County held that a web address of a judgment debtor was intangible personal property and ordered a sheriff's sale. At the same time, it ordered the service provider, (Network Solutions) to transfer the web address to the successful purchaser. The Virginia Supreme Court reversed the Circuit Court, finding that a website address, and, as it specifically stated, a telephone number, could not be garnished by a judgment creditor because the debtor lacked a property interest in it. What the debtor did have according to the decision was no more than a contractual right to use a web address or telephone number by way of a personal services contract with the service provider: "*...In other words, whatever contractual rights the judgment debtor has in the domain names at issue in this appeal, those rights do not exist separate and apart from NSI's services that make the domain names operational Internet addresses. Therefore, we conclude that a domain name registration is the product of a contract for services between the registrar and registrant....*"

The court extended this principle to telephone numbers as well: "*We are cognizant of the similarities between a telephone number and an Internet domain name and consider both to be products of contracts for services. See Dorer, 60 F.Supp.2d at 561. In our*

*opinion, neither one exists separate from its respective service that created it and that maintains its continued viability*". [5]

The holding in *Network Solutions* defines what property rights a debtor may have in a web address or telephone number in exactly the same manner as Section 541(a)(1). For instance, Virginia Code §§ 8.01-466 *et seq.; id.* § 8.01-501 *et seq.* provides that with respect to tangible personal property, such as automobiles and appliances, the officer would seize the property, dispose of it by judicial sale, and distribute the proceeds, less expenses, to the judgment creditor. In determining what property might be subject to seizure and sale pursuant to a judgment lien, Virginia Code § 8.01-478, *id.* § 8.01-487 *et seq.* provides that the lien extends to "all the personal estate of or to which the judgment debtor is, or may afterwards and on or before the return date of such writ become, possessed or entitled." *id* § 8.01-501. This statute thus reaches the debtor's "intangible" personal property, which includes a wide range of rights and debts held by the judgment debtor. In *Network Solutions,* those rights did not include the debtor's website address or telephone number.

Further support for the proposition that the debtor's telephone number did not become property of the estate is found in the Tariff regulations published by the Virginia State Corporation Commission. Alexandria LLC's Trial Exhibit 8 (JA) consists of an excerpt from

---

[5] In the case of *Dorer v Arel*, decided before *Network Solutions*, and cited by the Virginia Supreme Court, a U.S. District court cast considerable doubt on the argument that domain or website addresses were a form of intangible personal property.

the "General Tariffs", Va. SCC No 201 which regulate the terms of the contract between the telephone service provider and the subscriber.  In the case of Verizon, which was the service provider from whom the number was originally obtained, the Tariff provides in Section c. 9 (Establishment and Furnishing of Service) "*Provision and Ownership of telephone Numbers - The customer has no property right to the telephone number or any other call number designation furnished by the telephone company*". Although at the commencement of the case the service provider was Cox Communications, the same Tariff Regulations applied. See JA 673:12-23. [6]

<u>Any Service Contract with the Debtor
And all Rights Thereunder Were
Irrevocably Rejected by the Trustee</u>

If the telephone numbers and web addresses were not property of the debtor, but instead were products of a service contract as the Court in *Network Solutions* found, then what rights did the trustee possess in those contracts at the time he purported to sell them?

---

[6]  The trial court relied on the case of *In re Connecticut Pizza*, 193 BR 217 (Bankr.D.Md.1996), to reach the opposite conclusion, the Virginia Tariff Regulations notwithstanding. See TR (April 18), 187:7-25.  The court in *Connecticut Pizza* held that the debtor had a "possessory interest" in the telephone number which was protected by the automatic stay.  However, not only did Alexandria International not have possession of the telephone number by the time its case was converted, a possessory right under an executory contract is far different than a property right standing alone and subject to sale. Moreover, the Maryland Court was not constrained by the Virginia Supreme Court's decision in *Network Solutions*.

trustee possess in those contracts at the time he purported to sell them?

The service contract of Cox Business Services which furnished both the telephone number and the website address to Alexandria International was listed by the debtor on its Schedule G - "Schedule of Executory Contracts". See JA 47. 11 U.S.C. 365(d)(1) provides that "*In a case under Chapter 7 of this title, if the trustee does not assume or reject the executory contract or unexpired lease of residential real property or personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60 day period fixes, then such contract or lease is deemed rejected.*"

Under Section 365(p)(1), "*If a lease of personal property is rejected or not timely assumed by the trustee under subsection (d), the leased property is no longer property of the estate...*"

Under 11 U.S.C. 348(b), 'Effect of Conversion" the "order for relief" is the date of conversion from Chapter 11 to Chapter 7, or in this case, January 27, 2012. The trustee had immediate access to the debtor's schedules, including Schedule G, but no motion to extend the time to assume or reject the executory contract with Cox was filed. In fact, nowhere in the record does it appear that the trustee showed any interest in them. Thus, by operation of law, on or about March 28, 2012, the trustee was deemed to have irrevocably rejected the service agreements with Cox Business Services, which included both the telephone number and the website address. Since Section 365(d)(1) provides for an extension of time only in

26

circumstances where the trustee moves for it within the original 60 day period, under the plain language of the code, neither the court nor the trustee can extend that time otherwise or "undo" the rejection.

Even if one accepts the reasoning in *Connecticut Pizza* that the debtor had a possessory interest its telephone number, that right existed only as an element of the service contract between the debtor and Cox, and was lost to the estate once the contract was rejected. In short, the trustee lacked the ability to sell the debtor's rights under the rejected service contract, and therefore could not sell the old telephone number and website address of the debtor to ACG once the case had been reopened.

The appellant argues that this issue was introduced for the first time on appeal to the District Court, although, the appellant does concede that the argument was raised in the trial court. In closing argument, Alexandria LLC's counsel explicitly made the very argument regarding executory contracts made in its appeal. See JA 675:20-676:3. In asking for a denial of the trustee Motion to Sell, the Appellant's counsel pointed the court to the debtor's Schedule G which listed the telephone service and website hosting service provided by Cox Communications and argued that the trustee had 60 days to accept or reject the Cox contracts, and that even by the close of the case the trustee, who had notice of the contracts, had not assumed them.

The appellant argues, in essence, that more was not done to highlight the rejection argument based on Section 365. The appellee contends that no more was needed to support the argument than that which was done: the proper schedules (Schedule G) were brought to the court's attention, and the argument was stated explicitly. The appellant's implication is that somehow the argument needed to be expressed less succinctly, dwelt on, or argued redundantly, before it can be considered "raised". However, the appellee is comfortable, and likewise asks this court to be comfortable, in assuming that the bankruptcy judge, although he ruled against the appellee at the trial level, is familiar with the Bankruptcy Code, did his job well, and listened carefully to and considered all arguments presented to him.

### The Court Lacked any Basis Upon Which to Make a Distinction Between "Computers" and "Servers"

In it ruling, the Bankruptcy Court acknowledged that the debtor had scheduled "Computers" on its list of personal property, Schedule B with a value of $3,895.00. The debtor's representative, John Hoofnagle, testified that the debtor had several desktop computers and servers on which it stored surveying data, including its surveying files, and that these were the items he included in the description "computers" on the debtor's Schedule B. See JA 443:24-444:9.

Sharon Hoofnagle testified that house location surveys were often digitalized and kept on the debtors computers, and that these were

28

the debtor's servers. See JA 512:18-513:14. Mrs Hoofnagle also testified that when the debtor began digitalizing its files, they were kept on some of the firm's old computers.   Since the only function of the servers was to store house location surveys, these old computers are the "servers".   No testimony was given and no evidence was introduced as to any distinction between the desktop computers and the servers, all were referred to as "computers". No expert testimony was received as to what difference, if any, existed between the desktop computers and the servers. Neither the Trustee nor Alexandria LLC made any effort to distinguish between the two or to prove that the servers were not "computers". No argument on that point was made by either side. Not a single word was spoken on the subject aside from the transcript references give above, and it is hard to conceive of what the "servers" were, if the were not computers.

In announcing its decision, the court acknowledged that an item scheduled by the debtor and not administered by the trustee was abandoned under 11 U.S.C. 554(c), and could not be sold by the trustee once the case was reopened.   Based on that, the court ruled that the desktop computers and their internal data had been abandoned, but at the same time it ruled that servers had not been.

The District Court correctly noted the absence of any testimony or evidence as to the difference between a desktop, a server, and a computer, the court's decision was an entirely

arbitrary ruling not supported by the slightest evidence, and was reversible error.

It is abundantly clear from reading the transcript, and consistent with common sense, to find that the desktop commuters and the desktops used to store House Location Surveys and termed "servers" were all computers. In fact, it is hard to credit an argument that somehow a "server" is not a computer, as clearly, the term "computer" is a broad category that includes both desktops and desktops used as servers.

<u>A Review of Some of the Factual Errors<br>Found in the Appellant's Brief</u>

As in the trial court, and the District Court below, the ACG has made a effort in its brief to denigrate the debtor, the appellee, and the Hoofnagles. The appellant continues on a witch-hunt looking for supposed wrongdoers in order to shift the court's attention away from the legal issues involved. For example, although the sale of the debtor's files is not an issue raised in this appeal, ACG has spent a considerable portion of its brief arguing that the Hoofnagles tried to deceive the trustee as to their value, a contention not supported by the record.

Whenever this occurs in ACG's brief, as it often does, one should always bear in mind that the ACG is not a creditor in the debtor's bankruptcy, and that neither the appellee, Alexandria LLC, nor the appellant, ACG, have any role or stake in the administration of the debtor's bankruptcy case. Simply put, ACG and Alexandria LLC

are complete outsiders to the bankruptcy case of Alexandria Surveys International, and when ACG pounds the table with indignation, its motivation is not an abstract desire to see justice under Title 11, but rather to hurt Alexandria LLC, its competition in the surveying business, by depriving it of its assets.

Nevertheless, on the second day of trial Mr. Flynn explains why he was bidding so much money for the debtor's surveying files and it telephone number.  To him, these things might have had only limited intrinsic value, but it was his desire to keep them out of the hands of his competitor, ACG, that motivated him. See JA 602:8-603:2.

Although the appellant has addressed all of the material arguments in the appellant's brief, there remain several gross mischaracterizations of the record that the appellee would like to bring to the court's attention, if only to provide insight into the manner in which this case has been litigated.

For example, the appellant consistently attempts to create a false impression as to the ownership of its competitor in the surveying business, Alexandria, LLC.  The appellant repeatedly makes the claim that the Alexandria LLC is owned by Paul and Sharon Hoofnagle, and that they together also owned the debtor. Not only is this completely untrue, there is not a shred of evidence nor one word of testimony to support it. For example, See  JA 424:22-23 and JA 519:2-13, in which both Mr. and Mrs. Hoofnagle testify as to who owned the debtor and who initiated the formation of the Alexandria LLC.  None of this is consistent with the ACG's assertion as to some

31

identity of ownership between the debtor and the appellee. Also see JA 596:1-17 and JA 647:23-648:18 where Mr. Flynn specifically explains why he did not want to go into business with Paul Hoofnagle.

## CONCLUSION

(1) The District Court correctly found that the Bankruptcy Court erred in entering an order reopening the case on the motion of ACG who was not a party in interest.

(2) The District Court correctly found that the Bankruptcy Court erred in holding that the telephone numbers and website address of the debtor were property of the estate subject to sale by the trustee.

(3) The District Court correctly found that the Bankruptcy Court erred in not finding that the telephone number and website address of the debtor was an element of an executory contract which had been rejected by the trustee.

(4) The District Court correctly found that the Bankruptcy Court erred when it ruled that the debtor's desktop computers had been abandoned, but its servers had not been, in the absence of any evidence or testimony upon which it could distinguish between "Computers" as scheduled by the debtor and the debtor's desktops and servers.

## STATEMENT CONCERNING THE NEED FOR ORAL ARGUMENT

The appellee favors an oral argument on this appeal. The appellee believes that oral argument with the opportunity it presents for rigorous examination of the party's contentions in the collegial atmosphere of the court's dialogue with counsel will be of great assistance to the court in examination of the issues presented by this appeal.

Respectfully submitted,


Alexandria Surveys, LLC
By Counsel


/s/ Richard G. Hall
RICHARD G. HALL
Counsel for the Appellant,
7369 McWhorter Place, Suite 412
Annandale, Virginia 22003
(703)256-7159,
Facsimile (703)941-0262
VAB No. 18076

## CERTIFICATE OF COMPLIANCE

This brief has been prepared in a monospaced font using Corel WordPerfect software, Courier 12 point.

Exclusive of the table of contents, table of citations, and the certificate of service, this brief contains 8,389 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.


May 2, 2014                    /s/ Richard G. Hall
                                 Richard G. Hall


34

<u>FILING AND MAILING CERTIFICATE</u>

I hereby certify that on this 2nd day of May, 2014, I filed with the Clerk's Office of the United States Court of Appeals for the Fourth Circuit the required copies of this Response Brief of Appellee via hand delivery and electronically using the Court's CM/ECF system which will send notification of such filing to the following:


    Robert Lee Vaughn, Jr.
    O'Connor & Vaughn LLC
    11490 Commerce Park Drive, Suite 510
    Reston, Virginia 20191
    rvaughn@oconnorandvaughn.com

    Counsel for Appellants


May 2, 2014               <u>/s/ Richard G. Hall</u>
                         <u>Richard G. Hall</u>